1    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF WASHINGTON
2              AT TACOMA

3

4  UNITED STATES OF AMERICA,    )  Docket No. CR05-5828RBL
                                )
5          Plaintiff,           )  Tacoma, Washington
                                )
6  vs.                          )  March 16, 2012
                                )
7  JUSTIN SOLONDZ,              )
                                )
8          Defendant.           )
   _____)
9

10

              TRANSCRIPT OF SENTENCINGS PROCEEDINGS
11       BEFORE THE HONORABLE RONALD B. LEIGHTON
              UNITED STATES DISTRICT COURT JUDGE
12
   APPEARANCES:
13
   For the Plaintiff:        THOMAS M. WOODS
14                           ANDREW C. FRIEDMAN
                             Assistant United States Attorneys
15                           700 Stewart Street, Ste 5220
                             Seattle, Washington 98101-1271
16
   For the Defendant:        MICHAEL C. NANCE
17                           Attorney at Law
                             615 2nd Ave., Suite 760
18                           Seattle, Washington 98104

19

   Probation Officer:        STEVE MCNICKEL
20

21  Court Reporter:          Teri Hendrix
                             Union Station Courthouse, Rm 3130
22                           1717 Pacific Avenue
                             Tacoma, Washington  98402
23                           (253) 882-3831

24

25  Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.

1          FRIDAY, MARCH 16, 2012 - 1:30 P.M.

2                        * * *

3          THE COURT:  Please be seated.  Good afternoon.

4          THE CLERK:  This is in the matter of the United

5    States of America versus Justin Solondz, Cause No.

6    CR05-5828RBL.

7       Counsel, please make their appearances.

8          MR. WOODS:  Good afternoon, Your Honor.  Tom Woods

9    and Andrew Friedman on behalf of the United States.

10         THE COURT:  Thank you.

11         MR. NANCE:  Good afternoon, Your Honor.  Michael

12   Nance for Justin Solondz.

13         THE COURT:  Mr. Nance, Mr. Solondz, good afternoon.

14      All right.  This matter comes before the Court for

15   imposition of sentence.  I have reviewed the presentence

16   report, the government's sentencing memorandum, the defense

17   sentencing memorandum and attachments, the supplement to the

18   defense sentencing memorandum and attachments and the second

19   supplement to the defense sentencing memorandum and the plea

20   agreement.

21      Are there documents that I should have reviewed that I

22   have not reviewed?

23         MR. WOODS:  I don't believe so, Your Honor.

24         MR. NANCE:  No, Your Honor.

25         THE COURT:  Okay.  Mr. Nance, have you had time to

1  review the presentence report with Mr. Solondz?

2      MR. NANCE:  I have, Your Honor, in fairly good

3  detail.

4      THE COURT:  Mr. Solondz, do you believe you

5  understand the recommendation that the presentence report

6  makes?

7      THE DEFENDANT:  Yes, I do, Your Honor.

8      THE COURT:  Mr. Solondz stands convicted of Count 1,

9  conspiracy; Count 5, arson.

10      The presentence report gives the guideline calculation.

11  The base offense level is 24.  There's a 12-level increase for

12  a federal crime of terrorism.  The adjusted offense level is

13  36, minus three levels for acceptance of responsibility.  The

14  total offense level is 33.  The criminal history category is

15  I.  The range is 235 to 293 months.  The recommendation is for

16  120 months followed by three years supervised release and

17  restitution in the amount of $6,092,649.95.

18      The government recommends 84 months.  The base level of 24

19  is because the fire created a substantial risk of death or

20  bodily injury to the fire fighters and to the destruction of a

21  state facility.  A federal crime of terrorism translates into

22  a revised criminal history of VI.

23      They note that Kolar got 60 months for two or three

24  arsons; Phillabaum, 36 months for one arson; and Waters, the

25  parties recommend 48 months.

1    The defense asks for -- agrees with 84 months.  They argue

2  that the criminal history is exaggerated, and they are seeking

3  Bureau of Prisons management variable from the criminal

4  history calculation of VI to a lesser category.

5    So those are the high points.  Mr. Nance, I will hear from

6  you first.

7        MR NANCE:  Thank you.  Your Honor, as the Court has

8  noted, the parties agree on the proper sentence here.  It is

9  in the plea agreement.  We have a basic agreement on the facts

10  of the case.

11        THE COURT:  Right.

12        MR. NANCE:  Mr. Solondz agrees that he was part of

13  this conspiracy, that he participated in the arson at the

14  University of Washington almost 11 years ago, that he helped

15  build the incendiary devices.  He agrees that he was out of

16  the United States between September of 2005 and July of 2011,

17  that he spent considerable time in China, including about 28

18  months in a Chinese prison.

19    We differ just a little, Your Honor, with the government's

20  perception of his relative culpability regarding the other

21  participants in this conspiracy arson.  He is characterized as

22  having a role greater than everyone but William Rodgers.  We

23  think it is appropriate to compare his actions with those of

24  the co-defendants in the UW arson, and really with the five

25  defendants in the companion arson of the Jefferson poplar

1    farm, the arson that occurred at the same time in Oregon.

2        In essence, of these 10 people, Justin Solondz was the

3    youngest of the bunch by several years; he was just 21 years

4    of age at the time.  He did not have their experience at prior

5    arsons.  He was not part of the conception of the planned

6    burn, the Center for Urban Horticulture at UW, nor did he have

7    the credibility with the group to even be invited to their

8    planning sessions.

9        His overall role, even considering his involvement in

10   helping make the incendiary devices, we would submit, was no

11   greater than the average participant and may have been less.

12   To appreciate this, it is, I think, helpful to understand the

13   nature of the conspiracy and the conspirators.  You can refer

14   to them as the family, you can call them the Earth Liberation

15   Front, the Animal Liberation Front, the Radical Underground

16   Environmentalist Vanguard, whatever term you want to put on

17   it.

18       This was a loose, nonhierarchical group of people with a

19   strong affinity for the environment, with very differing

20   opinions on the severity of the proper tactics to take to

21   address problems with environmental degradation.  The planning

22   and strategy sessions for these tactics of this loose group

23   were known as so-called book club meetings.

24       Now, the book club meetings, it becomes clear if you read

25   through the discovery, they were the guts of the conspiracy.

This was where open brainstorming was encouraged, where ideas and expertise was exchanged, where personal alliances were created and confirmed.  It's really where conspiratorial plots were hatched.  It was a privilege.  It was a mark of recognition by the radical echo activists to be invited to and accepted into these planning sessions, these book club meetings.

And with two exceptions, all of the people in the arson at UW and all of the people at the companion arson at Jefferson poplar farm in Oregon, the people who comprised the general conspiracy charged in the Indictment, all of these people had attended and participated in these book club meetings.  The two exceptions were Briana Waters and Justin Solondz.

If I could give just a brief overview of our perception of the other participants in the UW arson.  The sort of unquestioned mastermind of this arson was William Rodgers, who was 36 years of age at the time of the arson.  He had a long history of committing arsons, by one count, six arsons over a four-year period.  He planned the UW arson, along with others, at the book club meetings.  He recruited everyone for the UW arson, and he assigned them tasks.

He personally planted the devices, the incendiary devices, in the Center for Urban Horticulture, together with one of the Jefferson poplar conspirators, Stanislas Meyerhoff.  He coauthored the widely-distributed manual on how to construct

incendiary devices with timers.

He helped -- Rodgers did -- helped write the communique after-the-fact of the UW arson. He recruited Mr. Solondz, a man 15 years his junior, to participate in the action for a purpose, and the purpose was to stop genetic engineering of poplar trees. Mr. Solondz didn't fully understand the full significance of the priority of that, but he accepted it. The decision to do the arson at the Center for Urban Horticulture had already been made. It was a question of filling out the roles, and when Rodgers recruited him, that is what he was doing.

One of the other key figures here was a woman named Jennifer Kolar, who was 27 years of age at the time. Remember, Mr. Solondz was 21. She's 27. She participated, according to her plea agreement, in three different arsons and one attempted arson going back as far back as July 1997, the Cavel West arson in Oregon, where she helped produce what was called vegan jello. It's a fuel mixture with glycerine soap and diesel. In that action, which was successful, she burned the place down. She acted as a lookout, poured fuel into the wall at the site.

And then a year later, she was involved in the Ray Gun Club arson in Colorado. There, she built and set up incendiary devices. Fast forward to the arson at UW in May of 2001, she's characterized as merely cutting glass. And then a

1   few months later in Susanville, California, she's an active

2   participant in the BLM Wild Horse Corrals there in Susanville.

3   In the fall of 2001, she set up incendiary devices there.

4        She was an active participant in the book club meetings in

5   at least three different states, maybe four.  Certainly,

6   California, Oregon and Washington.  At these meetings with

7   other conspirators, she was a well-educated woman.  She almost

8   had a Ph.D. in, I think it was, physics or something like

9   physics.  And she had professional work experience as well.

10       Anyway, she used that technical education and that

11  technical background to instruct others on computer encryption

12  expertise and the like that allowed the group to communicate

13  in code.  And at the California book club meeting, the other

14  people in attendance were the very conspirators that we're

15  talking about today:  William Rodgers, Lacey Phillabaum,

16  Stanislas Meyerhoff and the other Jefferson poplar people,

17  Danny McGowan, Joyanna Zacher, Nathan Block and Suzanne

18  Savoie.

19       Then there was a later book club meeting in Olympia, in

20  which the same people showed up who would commit the other

21  half there.  Of course, Mr. Solondz was not present at that

22  meeting -- at either meeting -- or at any other book club

23  meeting ever because he just didn't have the credentials

24  within the -- as a proven underground activist.  He was too

25  young.  He was too inexperienced.

1   There's a reference in the discovery to the so-called new

2   people, and that would be Briana Waters and Mr. Solondz as new

3   people.  They were above-ground activists, people that just

4   had not yet been fully vetted or trusted enough to participate

5   in the book club meetings where the real strategizing

6   occurred.

7        THE COURT:  Sounds like the development of the Crips

8   and the Bloods.

9        MR. NANCE:  Well --

10        THE COURT:  Initiation and getting your resume in

11   shape.

12        MR NANCE:  You have to kind of prove yourself to even

13   participate.  You've got to make the grade.

14   Jennifer Kolar was really one of the co-leaders at the UW

15   arson.  She filled a critically important role that we think

16   it is unfair to compartmentalize as, simply, she cut the

17   glass.  She was experienced enough to be trusted with what

18   really was a critical task in this mission.  This was a

19   high-anxiety sort of thing.  A rookie like Mr. Solondz

20   wouldn't have been trusted to do that because the person

21   cutting the glass had to maintain their poise, not lose their

22   cool, had to avoid leaving fingerprints, footprints, fiber,

23   hair evidence.

24   If she failed in the moment, the mission would fail, and

25   if she left telltale evidence at the scene, they would all be

caught.  She had the experience and the expertise for this
major role.  Justin Solondz did not have that.

The same is true for Lacey Phillabaum.  She had a long
activist involvement.  She hadn't done as many arsons as
Jennifer Kolar.  In fact, she pled to a single arson.  But she
had been to a number of these planning sessions, these book
club meetings in several different states.  She testified at
the Briana Waters trial two or three years ago, and she
testified to the nature of the book club meetings and her
conspiratorial nature, and according to her testimony, they
discussed things such as what are we going to do now to
inspire the movement and what directions of movement should we
take next.

By the second or third book club meeting, the entire group
was receiving special training from characters like Meyerhoff
and a woman named Chelsea Gerlach on how to construct
incendiary devices, and the whole group would practice, and
Phillabaum in her testimony describes soldering to make the
devices.

So at the scene, to bring us back to the UW arson, she's
sort of compartmentalized.  She's merely the person that
handed the stuff to Rodgers after he went into the place.  But
again, this is a critical role.  She's right there in the
moment, and only the experienced and trusted need apply for
this sort of thing, stuff that -- experience and trust that

Justin Solondz did not have.

Immediately afterwards, or within a day or so of this, she helped write the communique about what had happened, announcing to the world the horrible nature of what was going on at the UW, et cetera, and she admitted that she's written other communiques at other actions.

Well, Mr. Solondz did not have that experience. He hadn't earned the trust yet to do the hands-on stuff at the very site of the arson and certainly not to compose a statement that purports to speak for the group. Yes, he did help make the devices, but he had help in doing that. He did so offsite at a so-called clean room. He did it in advance so that his work could be checked and monitored and fixed if it wasn't up to snuff.

They really didn't need Justin Solondz to make an incendiary device. They were the experts. Remember, Rodgers and Meyerhoff had written the manual on how to do it, and the other members had been to the book club meetings where, again, they were specifically trained in the project -- in the subject. Justin Solondz was told to build the devices, to help with that, because the others needed for him to get his hands dirty. That is why he was assigned this role.

Now, he accepts responsibility for what he did. He helped commit this terrible crime. He helped construct the device to make it happen. He believed what he was told, that this was a

1   limited action.  It may seem crazy to think you can start a

2   small fire in the office and the fire fighters are going to

3   come and put it out, but he believed that.  He also believed

4   that no person would be endangered.

5          THE COURT:  Ever hear of the Pang fire, the warehouse

6   fire?

7          MR NANCE:  I certainly have.

8          THE COURT:  Did he know it?  Was he smart enough to

9   figure out that firemen were going to be in jeopardy?

10         MR NANCE:  In hindsight, it is obvious, that's the

11  reason arson is such a terrible thing, one of the things.

12     What he did, constructing the device and serving as the

13  get-away driver, I would suggest would have been more easily

14  replicated than finding willing accomplices who were able to

15  competently break glass at the scene and hand devices to

16  Rodgers.

17     Under these circumstances, it is not accurate to say that

18  Mr. Solondz, Justin Solondz, played a greater role than most

19  others at this arson.

20     I mentioned the communique that was written a day or so

21  later.  It appears that Lacey Phillabaum and Daniel McGowan

22  were the two principal authors of the communiques.  It's hard

23  to tell for sure, but it sounds like there were two different

24  communiques written.  They were sent to the so-called press

25  office or press agent of the ELF, and it was modified either

there or by Rodgers.  I don't believe anybody really knows for sure.  But Mr. Solondz, Justin Solondz, had no role in writing, formulating or editing any communique.

Of the four participants in that arson, the one that he's most similar to, we submit, is Briana Waters.  Briana Waters is four years his senior.  She was 25 years old at the time. She didn't help build incendiary devices, but she did help provide the cover for it, and she certainly knew about it.  If you view her situation prior to her cooperation, she was very late coming to the table on this, as you well know.

At her first sentencing, after she put the government to the test at trial -- and she's openly admitted this -- she openly perjured herself at that trial, refused to accept responsibility for her actions, and instead posturing as a martyr for the cause who was targeted and convicted by a corrupt legal system.  She got six years.  Six years.

Justin Solondz hasn't perjured himself.  He's admitted guilt and responsibility.  He has not played the martyr.  He's in a more favorable position than Briana Waters was at the time of her sentencing.  She got six years.  Although he shouldn't get any more than that, we've agreed to ask for seven, and that is what we are asking for today.

If we broaden the comparison for just a moment to include the other conspirators in the events of May 21st, the Jefferson poplar farm people, all of those participants --

1  Block, Zacher, Savoie, McGowan and Meyerhoff -- were all

2  radical echo activists with multiple arsons to their credit.

3  All had attended multiple book club meetings.  I singled out

4  Danny McGowan for comparison in my brief because he received

5  seven years, and that's the recommendation the government and

6  the defense is making in this case.

7      We would submit that McGowan's conduct was far more

8  aggravated than Justin Solondz' conduct because McGowan also

9  helped construct incendiary devices, including the very

10 incendiary devices that were used at UW in this arson.

11     He was convicted of two arsons.  He was five years older

12 than Mr. Solondz.  He was more seasoned than he was.  He had

13 experience writing communiques after various arsons.  He had

14 attended several book club meetings and, as late as 2005, some

15 four years after the arson, at a time when Mr. Solondz had

16 clearly moved on to other aspects of life, Mr. McGowan, Danny

17 McGowan, is out obstructing -- talking about it at least --

18 obstructing Grand Jury investigations.

19     McGowan did not cooperate.  He got seven years.  Justin

20 Solondz, who never attended a book club meeting and is here

21 for a single arson, and who left this life behind again in

22 2001, shouldn't get a day more than Daniel McGowan who got

23 seven years.

24     Justin Solondz does not see himself as a martyr for any

25 cause.  He does not speak for any group, the ELF or anyone

1    else, and they don't speak for him.  His participation in this

2    crime was a very expensive lesson on how to conduct himself,

3    how to relate to others, and it drove him into a long,

4    probably lifelong search for self-understanding and meaning.

5        There's talk about others have provided cooperation and he

6    hasn't.  None of the other four UW codefendants came forward

7    until after they were formally charged.  The earliest was four

8    years, almost four and a half years after the arson.  Of

9    course, for Briana Waters it was ten years after the arson.

10       Mr. Solondz doesn't fault them for doing that.  He's not

11   in a position to cooperate.  By the time he returned to U.S.

12   soil last July, the arson and his connections to the

13   surrounding characters were ten years old.  Most of the other

14   participants in the Waters conspiracy have been prosecuted,

15   located.  He doesn't have any useful information to give the

16   government about anyone or thing.  And he's frankly more

17   comfortable working on his own self-awareness, his own

18   relationship to the world than in trying to improve his

19   position by taking down others.

20       Incidentally, he wishes the very best to his former

21   conspirators, hopes for the very best, including Briana Waters

22   who I think will be sentenced later.  He hopes for the very

23   best for her.

24       Who is Justin Solondz?  Well, I think you get a flavor

25   from reading the letters that I submitted, and I didn't mean

to overwhelm the Court with them, but they were overwhelming me, and I just passed them along.  He's obviously made a very deep impression on almost everyone that has ever known him from a very young age.

He strikes most of the people as the kind of person that you would want to have as a personal friend.  He's considerate.  He's thoughtful.  He's honest about his feelings.  He's kind hearted, compassionate.  And this goes back a long way.  He remembered as a young child on vacation looking out for the welfare of the under-privileged hotel help, and that was striking to me.  He's remembered as making socially awkward classmates feel welcome, brokering peace on his high school soccer team among competing cliques.  He's respectful of his elders.  I can tell you, he's one of the few clients I have, present or past, that calls me Mr. Nance.  He's the guy everybody wanted to be friends with.  In fact, one writer said he was "a bright shining light wherever he went."

THE COURT:  Have you tried to analyze, draw the connection between those descriptors and the conduct?  Because it is tough to see somebody who does something like that, has to put -- he's either got a low empathy quotient or he just disregards his own belief about people in support of some moral --

MR NANCE:  I don't think it is for any lack of

empathy.  I mean, I was on the phone with him a day or two ago talking, and he was concerned about cutting into the time of the other inmates talking to their lawyers and, therefore, we needed to cut our conversation.

He is -- that is not where I think he's coming from at all.  I think it is more of in his youthful sort of vigor -- he's an idealistic guy.  He still is.

THE COURT:  Sure.

MR NANCE:  He still is.  He still is now, but he was maybe even more so then, and there's a tendency -- if you take anything to its absolute logical extreme, you start seeing the world in black and white.  And I think it was this notion -- I am just sort of playing parlor psychologist here -- but it is the idea of, you know, this is our little above-ground political protest, they are getting a little attention but they aren't really getting the effect we want, nothing is really changing.  The wilderness is being savaged, and nothing is being done to stop it.  Nobody seems to really care.  We have to make a statement.  We have to do something.  It is the idea of sort of a Marley righteous blinders that --

THE COURT:  Moral superiority.

MR. NANCE:  Yep, I think he would agree --

THE COURT:  It is the same Kool-aid that the constitutionalists drink from.  They are parallel.

MR NANCE:  I wouldn't quarrel with you on that a bit.

He has to act now, he has to save the planet, this has to happen, and it is acting without recognizing the practical realities of property rights and severe collateral consequences, what can happen here.

He's had a lot of time to think about this. There has been a lot of water under the bridge. It's been 11 years -- almost 11 years, over half of it spent traveling, living in foreign cultures, talking to different people.

Justin Solondz is a different person now, a more mature person now by far than he was 11 years ago. He's still idealistic. He's more mature. He's more grounded. He's actually less interested now in political matters. I think even above-ground protests are something he wouldn't care to really do now.

He prefers -- I am not making this up -- he actually prefers reading the great philosophers about leading a good life. He knows he's got prison time to do here. He accepts that. We ask you to heed the words of one of his supporters to "hold him accountable for what he did but don't crush him."

The carefully-negotiated plea agreement with its agreed recommendation of seven months, we would submit does hold him accountable. It is a very stiff sentence. It meets all the requirements of the law, and it should be the Court's sentence.

THE COURT: Thank you very much, Mr. Nance.

1      Mr. Woods?

2          MR. WOODS:  Your Honor, may it please the Court.

3   Today marks one of the final chapters in a long saga that has

4   stretched back all the way back to May 2001, and you really

5   cannot overstate the terrible nature of the crime that

6   occurred on that night.

7      This was a crime that threatened the lives of the first

8   responders who arrived to find just a towering inferno, an

9   entire building engulfed in flames.  It is a crime that

10  destroyed years of research.  People who had just put their

11  heart, their energy, their money and their career into this

12  research only to see it literally go up in flames.

13     It is a crime that caused terror and fear for the people

14  who used that building, who didn't know what was next, what

15  else might be targeted.  It was a crime that caused fear for

16  the university and certainly for the community in which this

17  building was.  It was a crime that was senseless in every

18  respect.  I mean, we all hold beliefs that are dear and true

19  to our heart, but however noble those may or may not be, it is

20  never a justification to do a crime such as this.

21     Today also marks a sad day because the man who appears

22  before you today was a man who had great opportunity and

23  promise.  Many of the defendants who appear in this very

24  courtroom, they didn't have a chance to go to college, let

25  alone an elite one.

1    Many defendants come from broken homes, not ones with two

2  loving parents.  Many times the courtroom is empty or there's

3  no, or few, letters of support.  This defendant had that

4  support network.  Those letters, the wonderful letters --

5            THE COURT:  Right.

6            MR. WOODS:  -- from good people.  And yet he chose

7  the wrong course.  This is a person with a great mind, yet he

8  chose the wrong course.  It is someone who has spent nearly

9  his entire 20s and now into his 30s either on the run or in

10  jail.  It is sad.

11    We stand before you asking the Court to impose a sentence

12  of 84 months.  This was a sentencing recommendation that I

13  assure the Court we did not make lightly.  It is one that we

14  spent countless hours, both within the U.S. Attorney's Office

15  and, frankly, with Mr. Nance as to what was the just sentence

16  in this case.

17    When you look at the 3553 factors and you start with the

18  nature and circumstances of the offense, there really are

19  three things that stand out.  First, this was not a rash

20  decision.  It wasn't a heat-of-the-moment mistake.  It wasn't

21  something that was a split second of poor decision-making.

22  This is something that the defendant lived with for about a

23  month.  Whether it was the time when he was first approached

24  by this plan, whether it was the time he spent in the clean

25  room constructing the devices, whether it was on the drive up

from Olympia all the way up to Seattle, whether it was the
walk down to the university building, at each and every one of
those moments, those countless moments, he had the chance to
step back and say:  What am I doing?  What can this cause?
All the consequences that can happen from this terribly
reckless act, and yet he proceeded.

The second factor is his role in this offense.  Mr. Nance
uses words such as whether his role was greater, whether his
role was more important.  Here's one thing that I think is the
most appropriate word: serious.  Because if we put aside Bill
Rodgers, who we all recognize was the leader of this
conspiracy, when your role is to actually construct the
devices, when you sit there in that clean room assembling the
very materials that are going to start a fire, you can't
divorce what the consequences are of that action.

Maybe if you were the lookout; maybe if your role is to
cut the glass and help make entry; maybe if your role is to
walk down the items.  It certainly doesn't excuse for one
second and certainly doesn't minimize for one second what
those people did.  But perhaps you can somehow tell yourself I
am more on the periphery.  But boy, when you are constructing
the actual devices, you know what you are doing and you live
with the consequences of what might happen.

Finally, you cannot divorce, of course, when you talk
about the nature and circumstances of the offense, of just the

1   terrible nature of this crime.

2      The sentence is also appropriate when you put it in the

3   context of the other sentences that have been imposed in this

4   case.  The fact is, the other three surviving defendants all

5   provided substantial assistance to the government.  Lacey

6   Phillabaum and Jennifer Kolar testified in this courthouse.

7         THE COURT:  Right.

8         MR. WOODS:  Briana Waters' cooperation is perhaps one

9   of the reasons that the case resolved in the manner in which

10   it did.  Mr. Nance also mentioned Daniel McGowan.  Daniel

11   McGowan is -- let me put it this way.  The U.S. Attorney's

12   Office in Oregon credited him with cooperation.  They filed a

13   5K motion, and I understand why Mr. Nance characterized that

14   as not cooperating because it was an unusual situation in

15   which he provided information without identifying other

16   specific people who helped him.  But it was cooperation that

17   was recognized by the U.S. Attorney's Office in Oregon.

18      Finally, when we look at the 3553 factors, we look at the

19   history and characteristics of this defendant.  We are not

20   blind that the person who sits in this courtroom today is

21   someone who is different than when he came into this offense.

22   With age comes maturity.

23      But Mr. Solondz must atone for what he did, and so for

24   those reasons, we ask the Court to impose a sentence of

25   84 months.  The amount of restitution, which is not in

dispute, is $6,092,649.95, joint and several, and $200 in

special assessments.

Thank you.

THE COURT:  Thank you.

MR. NANCE:  I neglected to call attention to

Mr. Solondz' supporters in the courtroom, including his

parents who came from New Jersey, Paul and Bianca.

THE COURT:  Thank you.  Mr. McNickle, anything you

want to add to your report?

PROBATION OFFICER:  Unless Your Honor has any

questions beyond what's listed in our report, I will just

stand by what's in our justification.

THE COURT:  Thank you.

Mr. Solondz, anything you want to say to the Court before

the Court imposes sentence?

THE DEFENDANT:  No, Your Honor, I have nothing

further to say.

THE COURT:  The offense level is 33.  The criminal

history category is VI.  The range is 235 to 293 months.  The

recommendation is 84 months.

My judicial philosophy is when in doubt, trust the

lawyers.  You've done a good job of handling this case.  I

cannot take fault with the recommendation that you've made,

and I will accept the recommendation for 84 months.

The reasons for the sentence, apart from the obvious

seriousness of the offense, also deal with the personal

characteristics of the defendant, a work in progress, I

suppose.  But more than any other factor is the respect for

the rule of law.  People who have deep passions about

political events sometimes permit themselves to view

themselves as above the law.  I have had a number of cases in

the last couple of months when I have talked about

vigilanteism and people who don't trust the law -- the rule of

law any more.

     Last year I went to Albania, and they have got -- they

like Americans, they don't like Russians, but their culture is

so corrupt.  Parents of a third grade student have to bribe to

get the third grader grades and so forth, and one of the

things that bind us as a civilized people is the adherence to

the rule of law.  And what I said parallels between the

radical left and the radical right, there's very little

difference between their motives and their aims.

     I would tell you that in my life, I have seen the power of

the rule of law, to make right in justice, in time sometimes,

not immediate, not instantaneous.  It is a process, but it is

the only code that binds civilized people together.  You have

attacked that belief, that system, and that is perhaps the

most reprehensible thing about your conduct.

     Now, you are a bright person.  You are a young person.

Your life is not over.  You will no doubt be reading and

contemplating serious questions about the nature of man, the
relationship of man to man and spiritual issues. I hope that
you will take some solace from the many blessings that you
have been bestowed with: two parents who care for you, you
inherited a good mind, a keen mind.

Everybody in this courtroom right now has to live with
some regret. I do. I know all the people I work with here,
we discuss it. They have things that they have done in life
that causes them pain, but you get on with it. You get on
with it. Think of those people who lost the research and
their career. Ponder the rules that we ascribe to, adhere to.
You will be out, and I doubt you will do anything but be a
healthy, happy individual, I hope.

So Mr. Solondz, as to Counts 1 and 5, you will be
committed to the custody of the United States Bureau of
Prisons for a term of 84 months.

Upon release from imprisonment, you will serve a
three-year term of supervised release subject to the standard
conditions, as well as the following special conditions:

1. Cooperate in the collection of DNA;

2. You will be prohibited from possessing a firearm or
destructive device;

3. You will submit to one drug and/or alcohol test within
15 days of placement on probation or release from
imprisonment, and at least two periodic drug and/or alcohol

1    tests thereafter, not to exceed eight valid tests per month.

2        You will participate as instructed by the U.S. Probation

3    Office in a program approved by the probation office for

4    treatment of narcotic addiction, drug dependency, or substance

5    abuse, which may include testing to determine if you've

6    reverted to the use of drugs or alcohol.

7        The defendant shall also abstain from the use of alcohol

8    and/or other intoxicants during the term of supervision.  You

9    must contribute toward the cost of any programs, to the extent

10   you are financially able to do so.

11       You will submit your person, residence, office, safety

12   deposit box, storage unit, property, or vehicle to a search

13   conducted by a U.S. Probation Officer or any other law

14   enforcement officer at a reasonable time and in a reasonable

15   manner, based upon reasonable suspicion of contraband or

16   evidence of a violation of a condition of supervision.

17       Failure to submit to a search may be grounds for

18   revocation, and you will notify any other residents that the

19   premises may be subject to searches pursuant to this

20   condition.

21       Restitution in the amount of $6,092,649.95 is due

22   immediately.  Any unpaid amount is to be paid during the

23   period of supervision in monthly installments of not less than

24   10 percent of your gross monthly household income.  Interest

25   on the restitution shall be waived.

1   You will provide the probation officer with access to any

2   requested financial information, including authorization to

3   conduct credit checks and obtain copies of your federal income

4   tax returns.

5   You will not obtain or possess any driver's license,

6   Social Security number, birth certificate, passport or any

7   other form of identification in any other name other than your

8   true legal name, without the prior written approval of the

9   defendant's probation officer.

10   You will not have contact with co-conspirators in

11   Washington and Oregon or members of any group or individuals

12   whose purpose is the unlawful use, or threatened use, of

13   violence against persons or property to intimidate or coerce a

14   government or civilian population in furtherance of political

15   or social objectives.

16   The Court finds the defendant does not have the ability to

17   pay a fine.  However, he shall pay a special assessment in the

18   amount of $200 for Counts 1 and 5, $100 each, respectively.

19   So is there any reason why judgment comporting with that

20   order isn't appropriate now?

21       MR. WOODS:  No.

22       MR NANCE:  Your Honor, I would ask the Court to make

23   a finding or state as a basis on the record, or at least a

24   partial basis, that the Court's departure variance is the

25   criminal history category VI, overstating Mr. Solondz'

1  criminal history and/or propensity to commit future crimes.

2  Additionally, and this is in our briefing --

3          THE COURT:  Right.

4          MR NANCE:  -- the statute actually invites the Bureau

5  of Prisons to designate and to consider the Court's statements

6  concerning the purpose for which the sentence to imprisonment

7  was determined to be warranted and/or recommending a type of

8  penal or correctional facility as appropriate.

9      We believe and would like to see Mr. Solondz placed back

10  near his family in the New York/New Jersey region.  Maybe it

11  is asking for too much, but I think his family found this New

12  York based Bard Prison Institute, and apparently there's a

13  statutory basis -- there's discretion within the Bureau of

14  Prisons to permit that sort of thing.  One of the factors they

15  consider is any court commentary on that.

16          THE COURT:  Mr. Woods?

17          MR. WOODS:  Your Honor, we have no opposition to any

18  of those recommendations being made.

19          THE COURT:  Well, I guess he has benefited in some

20  way from being on the run so long and maturing.  I don't judge

21  him to be a serious threat to commit violence in the future.

22  I don't get much of a picture of himself because he doesn't

23  want to speak, so everybody else has spoken for him, I guess.

24      But I will say that the criminal history category of VI is

25  not justified by the conduct that I have seen from the record,

from his last six or seven years of his life.  And anything
more than that, if you want to make a specific recommendation
for the New York facility, I'd go along with that.  If you
want, put it in the judgment.

Do you want the facility?  18 U.S.C. 3621(b) --

MR NANCE:  It's 18 -- that's right, 3621(b), that's
the authority for it.  There are five particular state prison
systems in New York.

THE COURT:  New York based Bard Prison Initiative?

MR NANCE:  Yes, I don't have the -- I can provide
those to the Court.  If not immediately, I can get them in the
very near future.  It is five state facilities within New York
State and, as an alternative to that, if for some reason the
Bureau of Prisons cannot agree to that, we would ask for FCI
Otisville, which I believe is in New York, in the area.

MR. WOODS:  Your Honor, if I may offer a suggestion,
which is that I believe a placement recommendation can also be
made as an order, that the Court would make recommendations.

I wonder, just in light of getting the precise language
down, whether that might not be better done after the specific
facilities are identified.

THE COURT:  We can certainly do that, if Mr. Solondz
waives his presence and you can work on that and give it back
to me to sign the judgment if you want, in short order.

MR. WOODS:  Your Honor, perhaps we also can turn the

1    judgment in and a proposed order that just sets forth

2    recommendations on placement.  I believe the authority is that

3    placement recommendations are just recommendations.

4          THE COURT:  Yes.  You want categorical

5    recommendations instead of a specific place.

6          MR. NANCE:  We would be willing to waive his presence

7    if there's a hearing required for that.

8          THE COURT:  If you guys agree with it, I will sign

9    it.  Sometimes -- there are some offenses that we talk about

10   that -- a possession of a drug in Texas gets 30 months, and we

11   give them a ticker tape parade.  So I recognize that place

12   matters, and I don't want to give Mr. Solondz a ticker tape

13   parade.  I just want him to know he's got a future, and I

14   don't want anybody to suffer paralysis because of their past

15   conduct.  That is all.  But you've got to do the time.  Okay?

16         THE DEFENDANT:  Yes.

17         MR. WOODS:  May I approach Mr. Nance?

18         THE COURT:  Yes.

19         MR NANCE:  It looks to be in order.

20         MR. WOODS:  May I approach?

21         THE COURT:  What are we going to do?  You are ready

22   for me to sign this, the categorical --

23         MR. WOODS:  We would ask you to sign it and the

24   parties would come forward with a proposed order on placement

25   recommendations, I believe is what we would suggest.

1          MR. NANCE:  That would supplement this?

2          THE COURT:  Yes.  With that condition, the judgment

3   conforms to the order of the Court, and I am signing the

4   judgment at this time.

5      Mr. Solondz, at paragraph 11 of the plea agreement, if you

6   are sentenced to a custodial term within or below the

7   guidelines, which I have done now, you have waived your right

8   to appeal the sentence imposed by this Court.

9      Do you understand that?

10         THE WITNESS:  Yes, Your Honor, I do.

11         THE COURT:  That means the only collateral attack you

12  can take against the judgment is in the unlikely event of

13  ineffective assistance of counsel.

14         THE DEFENDANT:  Okay.

15         THE COURT:  Anything further?  I will await the

16  supplemental order.  Anything further?

17         MR. WOODS:  No.

18         MR. NANCE:  No.

19         THE COURT:  Court is at recess.

20     (Proceedings concluded at 2:25 p.m.)

21                     *   *   *   *   *
                     C E R T I F I C A T E
22
       I certify that the foregoing is a correct transcript from
23  the record of proceedings in the above-entitled matter.

24  /S/  Teri Hendrix_____          March 29, 2012
    Teri Hendrix, Court Reporter               Date
25